UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GUSTAVO MCKENZIE,

    Plaintiff,

    v.

PAUL A. JORIZZO, M.D., and
MEDICAL EYE CENTER-MEDFORD,

    Defendants.

No. 1:13-cv-1302-AA
OPINION AND ORDER

AIKEN, Chief Judge:

    Plaintiff Gustavo McKenzie ("Plaintiff"), a California prisoner, brings this 42 U.S.C. § 1983 action against Defendants Paul Jorizzo ("Jorizzo"), M.D., and Medford Medical Eye Center ("MMEC") (collectively, "Defendants"), alleging an Eighth Amendment claim for deliberate indifference to serious medical needs. Pursuant to Federal Rule of Civil Procedure ("Rule") 56(c), defendants move for summary judgment on Plaintiff's Eighth Amendment claim. For the reasons set forth below, Defendants' motion (Dkt. 41) for summary judgment is granted and this action is dismissed with prejudice.

Page 1 - OPINION AND ORDER

STANDARDS

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (citation omitted). As the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (internal quotation marks omitted).

"By its very terms, [the Rule 56(c)] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in the original). "When opposing parties tell two different stories, one of which is *blatantly* contradicted by the [summary judgment] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (emphasis added).

BACKGROUND

Plaintiff received medical treatment by Jorizzo, "a medical doctor licensed by the State of Oregon practicing in the specialty

of ophthalmology at the [MMEC]."[1] (Second Am. Compl. at 4A-1; Answer ¶ 1; McKenzie Decl. Ex. B at 1-2.) Plaintiff suffers from "primary open-angle glaucoma," a progressive disease where eye pressures affect the optic nerve. (Jorizzo Decl. ¶ 3.) Prior to being evaluated by Jorizzo on December 13, 2012, Plaintiff "suffered profound visual loss in his right eye well beyond legal blindness." (Jorizzo Decl. ¶ 4.) Plaintiff was referred to Jorizzo by the Department of Corrections and Rehabilitation, Pelican Bay State Prison, "for an urgent/emergent glaucoma surgery" because his intraocular pressures remained consistently high despite the administration of "maximum medical therapy" at the prison. (Jorizzo Decl. ¶¶ 4-5.) Jorizzo's initial examination of Plaintiff's right eye revealed an intraocular pressure of forty-five and visual acuity tests showed only "hand movement vision." (Jorizzo Decl. ¶ 6.)

---

[1] Near the end of his second amended complaint, Plaintiff states: "And under penalty of perjury, I solemnly swear that the foregoing [allegations are] true and correct." (Second Am. Compl. at 4A-12.) Thus, to the extent Plaintiff's allegations are based on personal knowledge and set forth material facts that would be admissible in evidence, the Court has included them in this background section. *See generally Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct."). At the same time, however, the Court has omitted reference to contentions that: (1) do not concern Jorizzo's treatment of Plaintiff; (2) the Court construes as argument, not evidence; and (3) repeatedly suggest "any competent opthamologist" would testify to certain facts (*see* Second Am. Compl. at 4A-8, 4A-10).

Page 3 - OPINION AND ORDER

Following an informed consent discussion with Jorizzo, it was decided that Plaintiff would immediately undergo a surgical procedure known as a "trabeculectomy," in order to allow fluid to escape from the eye and reduce intraocular pressures. (Jorrizo Decl. ¶¶ 6-7.) Jorizzo's chart notes from the day of the December 13, 2012 surgery indicate the following:

> It was explained to the patient that [his intraocular pressure] is suboptimally controlled, [and] further treatment is needed. Trabeculectomy surgery discussed in detail with the patient, patient had the opportunity to ask questions, and was offered further, more detailed explanation of procedure. [Visual acuity] is limited at this time and *it may get worse and may not improve.*
>
> It was also explained to the patient that in some cases, Fluorouracil injections may be necessary during the post[-]op[erative] period to ensure that the fluid in the eye is able to drain properly, and to optimize the final outcome of surgery. . . . Explained that [visual acuity] will be blurry for up to [three] months as the eye heals.

(Second Am. Compl. Ex. B1 at 3-4) (emphasis added).

At a post-operative visit on December 14, 2012, Plaintiff still had hand movement vision in his right eye and Jorizzo concluded that the surgery was successful since Plaintiff's intraocular pressures were significantly reduced. (McKenzie Decl. Ex. B at 3; Jorizzo Decl. ¶ 8.) Jorizzo's December 14, 2012 chart notes indicate, among other things, that Plaintiff needed to use an eye shield while sleeping; he was prescribed new eye drops for his right eye (Ocuflox, Durezol and Atropine); he was instructed to stop all "glaucoma" eye drops in his right eye (e.g., oculus dexter or "OD") but continue in the left eye (e.g., oculus sinister or "OS"); that his intraocular pressure was "very low" and his right eye was soft; that he needed to limit activity with no lifting, bending or straining; and that he would follow-up with "Dr.

Lafever," an optometrist at Pelican Bay State Prison, who could refer him to Jorizzo "as needed." (McKenzie Decl. Ex. B at 4, Ex. D at 1; Second Am. Compl. at 4A-6, Ex. B1 at 5-7.)

Plaintiff was seen for a follow-up visit with Adam Mpimsnwa ("Mpimsnwa"), M.D., at Pelican Bay State Prison on December 21, 2012. (McKenzie Decl. Ex. E at 1.) Plaintiff reported that "the pressure in [his right] eye [wa]s fine" and "that he had been seeing better after surgery, but yesterday he noticed his vision was worse." (McKenzie Decl. Ex. E at 1.) Mpimsnwa's chart notes indicate that an appointment with Dr. Lafever was going to be rescheduled (i.e., since Plaintiff refused a prior follow-up with Dr. Lafever after apparently being kept waiting in the rain) and that Mpimsnwa spoke with Jorizzo after the examination. (McKenzie Decl. Ex. E at 1.) Jorizzo informed Mpimsnwa "that he expected visual acuity to be worse after surgery for several weeks," that a sudden decrease in vision could be due to a small hemorrhage brought on by overactivity, and that Dr. Lafever "could and should check eye pressure at her first opportunity." (McKenzie Decl. Ex. E at 1.)

On January 9, 2013, Dr. LaFever examined Plaintiff and determined that the intraocular pressure in his right eye was fifty-four. (Second Am. Compl. at 4A-8.) Instead of "wait[ing] around," Plaintiff immediately returned to his cell and inserted glaucoma eye drops in his right eye to reduce the intraocular pressure. (Second Am. Compl. at 4A-8.) Plaintiff also stopped taking two of the three eye drops prescribed by Jorrizo— Durezol and Atropine. (McKenzie Decl. Ex. E at 2.) The medical staff at Pelican Bay State Prison documented the fact that Plaintiff refused

Page 5 - OPINION AND ORDER

to use his eye medications in the manner prescribed. (McKenzie Decl. Ex. E at 2.) Six days later, on January 15, 2013, Dr. LaFever examined Plaintiff and determined that the intraocular pressure in his right eye was thirty-four, which Plaintiff attributes to his use of glaucoma eye drops. (Second Am. Compl. at 4A-8, Ex. B-1 at 8.) Plaintiff also alleges that Dr. LaFever advised him that the "hole" in his right eye had "closed." (Second Am. Compl. at 4A-9.)

On January 28, 2013, at 10:50 a.m., Plaintiff was seen for a follow-up visit with Risenhoover Mpimsser ("Mpimsser"), a family nurse practitioner at Pelican Bay State Prison, who entered the following progress note in Plaintiff's medical file:

> [P]hone call to spec[ialty] clinic spoke with [registered nurse] Bree re[garding] optometry [follow-up] with information, [intraocular pressure] check [every three] months, Dr. Jorizzo called her back nothing can do for him [if] lost the sight in the right eye. [P]er [registered nurse] Bree, will notify optometrist p[atient] can see slight color out of the [right] eye in dim light, also notify optometrist p[atient] has stopped using the atropine [and] durezol eye drops since [January 9, 2013 and] stopped taking the acetazolamide (diamox) since November 2012. R[egistered nurse] will notify [primary care provider] when optometry avail[able] for updated UM for [intraocular pressure] check [and] eye exam.

(Second Am. Compl. Ex. B1 at 9; McKenzie Decl. Ex. E at 2.) At 11:40 a.m. that same day, Mpimsser entered a second progress note that stated: "[P]hone call to Dr. Jacobsen reviewed case, p[atien]t noncompliant with eye drops and diamox pills with recom[mendation]; continue his medications that he is reporting refusing until [he] can be seen by the optometrist. Document his refusals and not using his eye medications as prescribed. No other recom[mendation] at

this time."[2]  (Second Am. Compl. Ex. B1 at 9; McKenzie Decl. Ex. E at 2.)

Plaintiff's last follow-up visit occurred, at least on the record before the Court, on February 11, 2013.  (Second Am. Compl. Ex. B1 at 9; McKenzie Decl. Ex. E at 2.)  Mpimsser made a notation indicating that Plaintiff was being seen for medication management and that Plaintiff stated:

> [Y]ou are renewing those medications I am not taking[.] I have to come down for them [and] that is malpractice[.] I am suppose[d] to be seeing an eye specialist for those medications. If I cover my [l]eft eye I can see the outline of objects [and] color sometimes if the light is dim.

(Second Am. Compl. Ex. B1 at 9; McKenzie Decl. Ex. E at 2.) Plaintiff denied eye drainage to Mpimsser, but acknowledged that there was discomfort in his right eye. (Second Am. Compl. Ex. B1 at 9; McKenzie Decl. Ex. E at 2.)

Plaintiff filed this 42 U.S.C. § 1983 against Defendants on July 29, 2013, alleging an Eighth Amendment claim for deliberate indifference to serious medical needs.

## DISCUSSION

Defendants move for summary judgment on Plaintiff's Eighth Amendment claim alleging (1) there is no genuine issue of material fact as to whether Plaintiff's Eighth Amendment rights were violated; and (2) they are qualifiedly immune from suit.

"To prevail under 42 U.S.C. § 1983, a plaintiff must prove that he was 'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was

---

[2] This appears to be the only instance where a "Dr. Jacobsen" is referenced in the summary judgment record.

committed under color of state law.'" *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1152 (9th Cir. 2012) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)). Additionally, a plaintiff must "show that the federal right was 'clearly established' at the time of the violation, otherwise government officials are entitled to qualified immunity." *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 191 (1984)).

Although private parties do not generally act under the color of state law for § 1983 purposes, *see, e.g.*, *Simmons v. Sacramento Cnty. Superior Court*, 318 F.3d 1156, 1161 (9th Cir. 2003), "[a]nyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983," *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). Consistent with this understanding, courts have held that private physicians and medical entities are state actors for purposes of § 1983, when a state has delegated its obligation to provide medical care to inmates. *See Carl v. Muskegon Cnty.*, 763 F.3d 592, 596 (6th Cir. 2014) (collecting cases); *see also Conner v. Donnelly*, 42 F.3d 220, 225-26 (4th Cir. 1994) (private doctor who treated an inmate was a state actor even though he had no contract with the prison). The parties seem to agree that Defendants are state actors for purposes of this § 1983 lawsuit. (*Compare* Second Am. Compl. at 4A-1, *with* Defs.' Mem. Supp. at 7.) The parties disagree, however, about whether a reasonable trier of fact could conclude that Defendants violated Plaintiff's constitutional rights.

Plaintiff's § 1983 claim alleges a violation of the Eighth Amendment arising from allegedly deficient medical treatment, on a

Page 8 - OPINION AND ORDER

theory of deliberate indifference to serious medical needs. The Ninth Circuit's test for deliberate indifference to medical need is two-pronged: "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). The first prong of the Ninth Circuit's test is satisfied because Plaintiff's primary open-angle glaucoma was a serious medical need. *See id.* at 1066 (agreeing with the district court that monocular blindness is a serious medical need, and noting that "[o]ther courts have held that similar and even less serve losses of vision are serious medical needs."); *see also Wilhelm*, 680 F.3d at 1122. ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

The second prong of the inquiry presents a more difficult question. As the Ninth Circuit recently explained in *Colwell v. Bannister*,

> [a] prison official is deliberately indifferent under the [second,] subjective [prong] of the test only if the official knows of and disregards an excessive risk to

Page 9 - OPINION AND ORDER

> inmate health and safety. This requires more than ordinary lack of due care. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care. In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.

763 F.3d at 1066 (internal citations, quotation marks, and brackets omitted).

Plaintiff asserts that Defendants were deliberately indifferent to his medical needs in the followings ways: (1) Jorizzo was "consciously aware that he did not know [how] to perform a trabeculectomy;" (2) Jorizzo failed to insert "a tiny tube" into Plaintiff's right eye during the trabeculectomy, which eventually allowed the hole created to close up; (3) Jorizzo failed to schedule a second post-operative follow-up visit with Plaintiff regarding "the botched surgery;" (4) MMEC allowed Jorizzo to perform "a surgery that he could not [ha]ve been certified to do, or has no track record of [performing];" (5) Jorizzo failed to administer Fluorouracil injections during the post-operative period, even though he said such injections are necessary in "some cases" to optimize the final outcome of the surgery; (6) MMEC failed to intervene and prevent "Jorrizo from putting a senseless hole in [Plaintiff's] right eye;" (7) Jorizzo made "dismissive opinions" that were not based on an in-person examination of Plaintiff; and (8) Jorizzo failed to "follow-up and fix . . . the sen[s]eless, closed-up hole that he made in [Plaintiff's] right eye." (Pl.'s Mem. Opp'n at 6-9; Second Am. Compl. at 4A-10.)

Page 10 - OPINION AND ORDER

Initially, several of Plaintiff's assertions are simply belied by the record.[3] Contrary to assertions (1) and (4) above, Defendants' answers to Plaintiff's first set of interrogatories indicate that Jorizzo is board-certified in ophthalmology and had experience performing the surgery at issue.[4] (McKenzie Decl. Ex. B at 2, Ex. C at 2.) Defendants also admit that Jorizzo "is a medical doctor licensed by the State of Oregon practicing in the specialty of ophthalmology at the [MMEC]." (Answer ¶ 1.) Contrary to assertion (6) above, Plaintiff acknowledges that he consented to Jorizzo's performance of a trabeculectomy, which Plaintiff understood to involve the creation of a drainage system (or "hole")

---

[3] Throughout his memorandum in opposition, Plaintiff asserts that Defendants are "lying" about a number of relevant facts, including Jorrizo's claim that Plaintiff failed to follow post-operative instructions. (Pl.'s Mem. Opp'n at 12.) However, Plaintiff cannot create a genuine issue of fact simply by proffering conclusory allegations that witnesses are lying. *See, e.g., Johnson v. Queens Admin. for Children's Servs.*, No. 02-4497, 2006 WL 229905, at *5 (E.D.N.Y. Jan. 31, 2006) ("Plaintiff does not contradict CPS Williams' account that notice was given to Marion Johnson other than by his conclusory allegation that Williams was lying, which is insufficient to create a genuine issue of fact that plaintiff's procedural due process rights were violated.").

[4] Although Plaintiff sought the names and the addresses of Jorrizzo's prior patients during the discovery process, Defendants informed Plaintiff that his request sought documentation protected by state and federal law, including, but not limited to, the Health Insurance Portability and Accountability Act ("HIPAA"). (McKenzie Decl. Ex. B at 2, Ex. C at 3.) As one district court recently noted, "there are 'significant public policy reasons for keeping a [person]'s sensitive medical information restricted,' which HIPAA protects by allowing disclosure of only 'expressly authorized, limited, and specifically identified protected health information[.]'" *Ford v. United States*, No. 11-3039, 2013 WL 3877756, at *1 (D. Md. July 25, 2013) (quoting *Piehl v. Saheta*, No. 13-254, 2013 WL 2470128, at *2 (D. Md. June 5, 2013)). Clearly Plaintiff was not entitled to the names and addresses of Jorizzo's patients.

Page 11 - OPINION AND ORDER

that would allow fluid to drain from his right eye. (Pl.'s Mem. Opp'n at 4; Second Am. Compl. at 4A-5, 4A-6.)

Essentially, then, this case boils down to whether Jorizzo exhibited deliberate indifference to Plaintiff's serious medical needs based on the manner in which Jorrizzo performed the trabeculectomy and provided follow-up care. The only medical evidence presented at this stage is Jorizzo's declaration, wherein he states:

> 6. On December 13, 2012, . . . [a]n informed consent discussion was held with [Gustavo McKenzie] and he consented to a trabeculectomy.
>
> 7. A trabeculectomy is an appropriate surgical treatment to allow aqueous humor to escape from the trabecular mesh network and reduce intraocular pressures. My surgical procedure [on Gustavo McKenzie] was performed with appropriate technique and wholly within the standard of care.
>
> 8. The following day, December 14, the patient returned to my care. He still had hand movement vision in his right eye. The trabeculectomy was successful because the patient's pressures were significantly reduced.
>
> 9. Appropriate post-operative instructions for activity and medications were provided to Mr. McKenzie after each visit. Mr. McKenzie failed to follow post-operative orders, causing a spike in intraocular pressures which affected his vision.
>
> 10. I am familiar with the degree of care and skill provided by similar ophthalmologists and ophthalmology clinics in Jackson County and similar communities. All of the medical care provided by me and the [MMEC] to Gustavo McKenzie was reasonable and consistent with that degree of care, skill, and diligence used by ordinary careful ophthalmologists practicing in Jackson County, Oregon, or similar communities through the time alleged in plaintiff's complaint.
>
> 11. All of the medical care provided by me and the [MMEC] was wholly within the standard of care. Any damage caused to Gustavo McKenzie was due to his failure to follow post-operative orders and the progression of his disease.

(Jorizzo Decl. ¶¶ 7-11.)

Page 12 - OPINION AND ORDER

Plaintiff takes issue with the fact that Jorizzo doesn't specifically identify what post-operative instructions Plaintiff failed to follow, and states that Jorizzo "cannot point to any in particular." (Pl.'s Mem. Opp'n at 12.) The pleadings and exhibits relied on by Plaintiff, however, clearly demonstrate that he disregarded Jorizzo's instructions to (1) use Durezol and Atropine in his right eye until told to "stop" or "change," and (2) only use "glaucoma" eye drops in his left eye. (*Compare* McKenzie Decl. Ex. D at 1, *with* Second Am. Compl. at 4A-8, *and* McKenzie Decl. Ex. E at 2.) Plaintiff did so knowingly after apparently "discover[ing] that the eye drops that Dr. Jorizzo had prescribed (Atropine and Durezol) were major contributors to the return of glaucoma in [his] right eye." (Second Am. Compl. at 4A-8.)

Plaintiff appears to have made similar discoveries regarding the adequacy of the surgery and follow-up treatment provided by Jorizzo, as Plaintiff repeatedly notes that "any competent ophthalmologist" would testify to certain facts that conflict with the decisions made by Jorizzo. *But cf. Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.") For example, Plaintiff alleges that "any competent ophthalmologist would testify that, in order to do a 'trabeculectomy,' the Retinal Specialist-Surgeon must insert a tiny tube (in the hole created), which would serve as the 'new channel/ canal' for the fluid to flow through. But Dr. Jorizzo did not do that, which is why the hole he made closed up." (Second Am. Compl. at 4A-10.) Plaintiff also alleges that "any competent

ophthalmologist would agree that prolonged use of Atropine and Durezol may result in glaucoma." (Second Am. Compl. at 4A-9.)

What Plaintiff fails to recognize is that "[a] difference of opinion between a physician and the prisoner—or [even] between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Colwell*, 763 F.3d at 1068 (quoting *Snow v. McDaniel*, 681 F.3d 978, 982 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc)). Indeed, "[d]eliberate indifference is a high legal standard. A showing of medical malpractice or [even gross] negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) (citation omitted). To properly demonstrate deliberate indifference, "the plaintiff 'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Colwell*, 763 F.3d at 1068. (quoting *Snow*, 681 F.3d at 988).

Even when viewing the evidence in the light most favorable to Plaintiff, the record cannot support a finding that Jorizzo undertook a medically unacceptable course of treatment in conscious disregard of an excessive risk to Plaintiff's health. To be sure, Jorizzo informed Plaintiff prior to the performance of the trabeculectomy that his visual acuity "may get worse and may not improve," and Plaintiff chose to disregard certain post-operative instructions provided by Jorizzo based on a difference of opinion. (Second Am. Compl. at 4A-8, Ex. B1 at 4.) In addition to

Page 14 - OPINION AND ORDER

testifying that the medical care provided to Plaintiff "was wholly within the standard of care," Jorizzo maintains that "[a]ny damage caused to [Plaintiff] was due to his failure to follow post-operative orders and the progression of his disease." (Jorizzo Decl. ¶ 11.) Even assuming that Jorizzo's actions were not in conformance with that of a "competent ophthalmologist," as Plaintiff posits, the record simply cannot support a finding that Jorrizo's actions amounted to anything more than negligence or medical malpractice—which is insufficient to establish a constitutional deprivation under the Eighth Amendment. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim.

Because Plaintiff has failed to raise a triable issue of fact as to deliberate indifference, the Court need not address whether Defendants are entitled to qualified immunity. *See Amarir v. Hill*, 243 F. App'x 353, 355 (9th Cir. 2007) ("Because this case lacks any indicia of deliberate indifference, we need not address whether Dr. Hill and Dr. Friedman are entitled to qualified immunity").

## CONCLUSION

For the reasons stated, Defendants' motion (Dkt. 41) for summary judgment is GRANTED and this action is dismissed with prejudice.

IT IS SO ORDERED.
Dated this 6th day of January 2015.

_____
Ann Aiken
United States District Judge

Page 15 - OPINION AND ORDER